IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID A. KAUFMANN, et al.                      :

                                               :

        v.                                     :    Civil Action No. DKC 2009-0171

                                               :

THE TRAVELERS COMPANIES, INC.,                 :
et al.

### MEMORANDUM OPINION

Presently pending and ready for resolution in this breach of insurance contract case are a motion for summary judgment (Paper 22) and motion to seal (Paper 23). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.

For the reasons that follow, the motion for summary judgment will be granted and the motion to seal will be denied.

## I.   Background

This case involves insurance purchased for a family-owned restaurant, Kaufmann's Tavern. From 1982 until March 2003, one of the Plaintiffs, David A. Kaufmann ("Mr. Kaufmann"), was a partner with his brother in Kaufmann Enterprises, the sole owner of a parcel of real estate and improvements thereon, including the building that housed Kaufmann's Tavern. Mr. Kaufmann was also a shareholder in Kaufmann's Tavern, Inc., the sole owner and operator of the restaurant itself.

In 2002, Kaufmann Tavern Inc., Kaufmann Enterprises and David A. Kaufmann (collectively, "Plaintiffs") purchased a "RESTAURANT PAC," from several Travelers Insurance Company affiliates to cover their restaurant operations from January 2002 to January 2003.  The RESTAURANT PAC included a commercial general liability policy, issued by Travelers Indemnity Company of America ("TICA"), and an umbrella policy issued by Travelers Indemnity Company ("TIC").[1]  Plaintiffs have brought suit against TIC and TICA (as well as other Travelers defendants), alleging that Defendants breached the insurance contracts by failing to defend and to indemnify Plaintiffs in connection with an underlying suit that was brought in the Circuit Court for Anne Arundel County, Maryland ("circuit court").

In May 2005, KC, Inc. ("KCI") filed suit against Plaintiffs in circuit court in an action arising out of a real estate deal between Plaintiffs and KCI in which Plaintiffs sold the restaurant to KCI.  During the course of negotiations over the sale, advertising materials given to KCI represented that the restaurant "was comprised of 'two bars and 3 dining rooms seating a total of 400 people.'"  (Paper 17, Exh. 1 at 3,

---

[1] Seven other Travelers affiliates are named as defendants by Plaintiff.  Summary judgment will be granted as to these defendants because no insurance policies were ever purchased by the Kaufmanns from these affiliates.

quoting language from a brochure advertising the restaurant).
KCI had stated its intention during negotiations to Mr. Kaufmann
"to create a patio that would take full advantage and utilize
the 400 seat capacity." (*Id.*).

After taking possession of the restaurant and land in March
2003, KCI built a patio to accommodate additional people in the
restaurant.  After building the patio, KCI learned that the
septic system at the restaurant could only accommodate 226
patrons. (*Id.* ¶¶ 21, 24).

KCI argued in its complaint that Plaintiffs were aware that
the restaurant septic system could only accommodate 226 patrons.
KCI maintained that Plaintiffs had breached the sales agreements
by breaching warranties and failing to indemnify KCI for the
breach of those warranties.  Specifically, in the agreement,
Plaintiffs had warranted that it was in compliance with all
relevant laws and regulations at the time of execution of the
agreement.  Plaintiffs had 277 chairs and 20-30 barstools in the
restaurant at the time of the closing, however, in violation of
the 226 capacity imposed by the Anne Arundel Health Department.
(*Id.* ¶¶ 21-22).

KCI brought a complaint against Plaintiffs seeking damages
to recover monies it had expended to upgrade the septic system
in order to accommodate additional customers ("the underlying

action"). (*Id*. ¶¶ 29-30). The complaint contained four counts: i) breach of contract (warranties); ii) breach of contract (indemnification); iii) fraudulent inducement; and, iv) negligent misrepresentation.

Plaintiff made a timely demand on Defendants for defense, which Defendants refused to provide. (Paper 22, at 2). Plaintiffs accrued expenses of $124,514.77 in defending themselves against KCI. (*Id.*). The settlement cost Plaintiffs an additional $118,974.11. (*Id.*).

In October 2006, the circuit court granted Plaintiffs' summary judgment motion as to Counts III and IV of KCI's complaint. The case then proceeded to trial in January of 2007. Midway through trial, the parties settled via a confidential settlement agreement. (Paper 17, Exh. 2, at 14-15).

Plaintiffs then brought suit against Travelers, filing a complaint on July 15, 2008 in the Circuit Court for Montgomery County. (Paper 1). After they were served on December 30, 2008, Defendants timely removed the case to this court on January 27, 2009 on the basis of diversity of citizenship and amount in controversy. (Paper 1 ¶ 5).

In their complaint, Plaintiffs allege that Defendants breached the insurance policies issued to Plaintiff when they refused to defend and refused to indemnify Plaintiffs for

expenses in connection with the underlying action. Defendants filed a motion for summary judgment on August 7, 2009. (Paper 22). Plaintiffs responded on September 11, 2009. (Paper 22). Seeking to attach the Declaration of David A. Kaufmann to their response, Plaintiffs filed a motion to seal with the Declaration and other confidential materials related to the underlying action. (Paper 23). The motion to seal is unopposed. Defendants replied to the motion for summary judgment on October 23, 2009. (Paper 28).

Plaintiffs' complaint was initially filed against nine Travelers-affiliated Defendants. After reviewing the summary judgment motion, however, Plaintiffs have admitted that only TICA and TIC issued policies to Plaintiff and that the remaining Defendants "are therefore entitled to summary judgment as they did not issue any policy in question." (Paper 22, at 2). Plaintiffs further concede that "there is no coverage under the umbrella policy issued by TIC." (*Id.*, at 1). At the outset, summary judgment will be granted to all Defendants other than TICA.

Therefore, the only remaining Defendant in this matter is Travelers Indemnity Company of America, and the only policy in question is the commercial general liability policy ("CGL policy").

5

## II.   Analysis

### A.   Summary Judgment Standard

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(f); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  In other words, if there clearly exists factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007); *Emmett,* 532 F.3d at 297.  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  *Celotex Corp.*, 477 U.S. at 323.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."

*Id*.   Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 254; *Celotex Corp*., 477 U.S. at 324.   "A mere scintilla of proof, however, will not suffice to prevent summary judgment."   *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).   There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."   *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."   *Id*. at 249-50. (citations omitted).

In the case at hand, no dispute exists between the parties over the relevant facts.   Thus, the only question remaining at this stage is whether Defendants are entitled to judgment as a matter of law.

### B.   Maryland Insurance Law

Several central tenets of Maryland insurance law will be stated at the outset.   Under Maryland law, courts will determine the meaning of contract language by "adhering to the principle of the objective interpretation of contracts."   *Ace American Insurance Company v. Ascend One Corporation*, 50 F.Supp.2d 789,

794 (D.Md. 2008)(citing *ABC Imaging of Washington, Inc. v. The Travelers Indemnity Co. of America*, 150 Md.App. 390, 396 (2003)).   Furthermore, "when deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract." *Id.*(citing *Bausch & Lomb v. Utica Mutual*, 330 Md. 758, 779 (1993).   The words of any insurance policy are to be given their ordinary meaning.  *Id.*(citing *Warfield-Dorsey Co., Inc. v. Travelers Cas. & Sur. Co. of Illinois*, 66 F.Supp.2d 681, 685 (D.Md. 1999)).

When determining the scope and limitations of coverage under an insurance policy, Maryland courts "construe the instrument as a whole to determine the intention of the parties" and "'examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.'"   *Nautilus Ins. Co. v. BSA Ltd. P'ship*, 602 F.Supp.2d 641, 644-45 (D.Md. 2009)(citing *Clendenin Bros., Inc. v. United States Fire Ins. Co.*, 390 Md. 449, 459 (2006)). "When interpreting the language of a contract, we accord a word its usual, ordinary and accepted meaning unless there is evidence that the parties intended to employ it in a special or technical sense." *Id.*(citing *Clendenin*, 390 Md. at 459)(citing *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761 (Md. 1989))(internal quotations omitted).   The terms in the insurance policies in the

instant case are not ambiguous, and so the meaning of the terms is determined by the court as a matter of law.

### C.   Defendants' Duty to Defend

Plaintiffs allege that Defendants had a duty to defend them in the underlying action, and now have a duty to indemnify them for expenses related to the underlying action.  Defendants argue that they have neither, as the underlying action was outside the scope of the policies.

Under Maryland law, the insurer's duty to defend is a "contractual duty arising out of the terms of a liability insurance policy" and is "broader than the duty to indemnify." *Litz v. State Farm Fire and Casualty Co.*, 346 Md. 217, 225 (1997).  Whereas the insurer's duty to indemnify only attaches upon liability, "'[a]n insurance company has a duty to defend its insured for all claims that are potentially covered under the policy.'" *Cowan Sys. v. Harleysville Mut. Ins. Co.*, 457 F.3d 368, 372 (4th Cir. 2006)(citing *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1 (2004)).

In deciding whether to defend a policyholder, an "insurer may only rely on the language of the policy and the facts alleged in the complaint, and not on outside evidence, as that would risk deciding the question on facts not advanced in the underlying action." *Id*.  The Maryland courts have created a two-

9

part inquiry to determine whether an insurance company has a duty to defend an insured.

> (1) What is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) Do the allegations in the tort action potentially bring the tort claim within the policy's coverage?

*St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 193 (1981). This inquiry aids in framing the relevant analysis, which begins with an examination of the relevant insurance policy to discern the scope and limitations of the coverage. In this case, the policy at issue is the CGL policy issued by TICA. The CGL policy covers "bodily injury" or "property damage" in defined situations:

> 1. Insuring Agreement
>
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or property damage" to which this insurance does not apply. . . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

10

(2) The "bodily injury" or "property damage"
occurs during the policy period.

(Paper 17, Exh. 3, CGL Policy, Page 1 of 11 of CG 00 01 10 93

Form).

Step two of the analysis requires the court to analyze
whether the claims would fall within the language stated in the
CGL policy.   In order to fall within the CGL policy, several
prerequisites must be fulfilled: i) there must be an
"occurrence;" ii) there must be "property damage" and, iii) the
"property damage" must be caused by the "occurrence."   Finally,
the phrase in paragraph (a) limiting coverage to anything "to
which this insurance applies" references exclusions.   Thus, no
exclusion may apply to the policy in order for coverage to
exist.

     **1.   The Occurrence**

Defendants argue that no "occurrence" exists in the
underlying action.   They maintain that "the sale of the
restaurant and all events attendant to that sale cannot
constitute an 'occurrence' under Maryland law" because "when an
insured breaches a contract or makes an intentional
misrepresentation, there is no 'accident' because the damages
are expected, intended and foreseen."   (Paper 17, at 9-10).
Plaintiffs disagree, arguing that the term "occurrence" can
include negligent misrepresentation if the facts alleged do not

constitute grounds for fraud.  Additionally, they argue that an "occurrence" can "include damages that would otherwise arise out of breach of contract, provided that the insured did not foresee the resulting alleged damages." (Paper 22, at 6).

The CGL policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Paper 17, Exh. 3, CGL policy at Page 10 of CH 00 01 10 93).  In a case involving a policy with the same definition of "occurrence," the Court of Appeals of Maryland analyzed whether an insurance company had a duty to defend the insured after a family who purchased their house sued the insured for negligent misrepresentation.  *See Sheets v. Brethren Mutual Insurance Company,* 342 Md. 634 (1996).  The Court of Appeals held that

> an act of negligence constitutes an accident under a liability insurance policy when the resulting damage was an event that takes place without the insured's foresight or expectation.  In other words, when a negligent act causes damage that is unforeseen or unexpected by the insured, the act is an 'accident' under a general liability policy.

*Sheets*, 342 Md. at 652(internal quotations omitted).  In that case, a couple who owned a farmhouse sold the house to a family with nine children, representing that the septic system was in "good working condition." *Id.* at 637.  Approximately three

weeks after the family took possession, the septic system began leaking and effluent flooded the walk area. *Id.* The family sued the former owners (the Sheetses), claiming that they had negligently misrepresented that the septic system was in good working condition, and that had it not been for those misrepresentations, the family would not have purchased the house. *Id.* The Sheetses then sought a declaratory judgment to compel their insurance company to defend them in the underlying lawsuit. *Id.* The court held that the insurance company did have a duty to defend, because the incident could be considered an accident. The court found that

> [i]t is conceivable that the Sheetses never experienced a problem with the system while they were living on the farm with their two children and therefore, at the time they represented that the system was in good working order, did not anticipate that the [large family] would encounter any difficulties.

*Id.* at 658. In other words, the resulting damage (the leaky septic system) was an event that was not foreseen or expected.

Plaintiffs attempt to claim that a similar accident or "occurrence" is found in the instant case. The comparison fails for several reasons. First, in this case, there is no event that was unexpected or unforeseen. In *Sheets*, the insureds did not know that the septic system would fail if eleven people used it until it actually did fail. In this case, no event was

necessary, and none occurred: the septic system did not suddenly fail when 226+1 patrons attempted to use it.

Moreover, in the instant case, the allegation of negligent misrepresentation is based on different grounds than in *Sheets*. In *Sheets*, the family alleged that the insureds had violated the clause guaranteeing that the septic system was in "good working condition." *Sheets,* 342 Md. at 637.  In the underlying action in this case, the issue was not whether the septic system worked, as in *Sheets*, but how many people it could accommodate – a fact that was known prior to the signing of the contracts.  If the legal limit for the septic system had been for 400 patrons, and when KCI filled up the restaurant one night to capacity and the septic system broke, then the claim would be similar to the one in *Sheets*.

In this case, the "resulting damage" relates to the failure of Plaintiff to deliver a restaurant that could legally seat 400 patrons, not to any accident that occurred having to do with the septic system.

Plaintiffs cannot show that an "occurrence" happened under the breach of contract claims either.  In a case involving a breach of contract regarding a piece of property, the Court of Special Appeals of Maryland analyzed the meaning of "occurrence" as it relates to a contract.  In *Lerner Corp. v. Assurance Co.*

14

*of Am.*, 120 Md.App. 525 (1998), the purchaser of a building claimed defects in the building's façade and made a claim for the cost of repairs, pursuant to the contract for sale. *Id*. at 528-29.  The court reviewed the *Sheets* decision, and held that

> If the damages suffered relate to the satisfaction of the contractual bargain, it follows that they are not unforeseen. In other words, and in the context of this case, it should not be unexpected and unforeseen that, if the Building delivered does not meet the contract requirements of the sale, the purchaser will be entitled to correction of the defect. This, we believe, would be the expectation and understanding of the reasonably prudent lay purchaser of a CGL policy.

*Id*. at 537.  Just as the building purchasers in *Lerner* contracted to receive a defect-free building, in the instant case, KCI contracted to receive a building that was not in violation of any state statutes or regulations at the time of the closing.  The restaurant was in violation of state health codes, however, because it had provided seating for more than 267 patrons.  KCI alleged in the underlying complaint that Plaintiffs breached several clauses in the purchase agreement. Specifically, KCI maintained that Plaintiffs were in breach with several warranties, and a clause promising to indemnify KCI for any damages resulting from a breach of any warranty.

In both *Lerner* and the instant case, the terms of the contract were not fulfilled and the purchasers demanded remedial

15

steps be taken to fulfill the terms of the contract.   In *Lerner*,
the court found that it should not have been unexpected to the
insureds that the purchasers of the building wanted correction
of the defect so that the terms of the contract were satisfied.
Likewise, in the underlying action, it should not have been
unexpected or unforeseen that, when the restaurant delivered did
not meet the contract requirements of the sale, KCI was entitled
to correction of the defect.   Because it was foreseeable that
KCI would want to accommodate 400 patrons in the restaurant, as
was indicated it could do in sales materials, no accident
occurred.[2]

**2.   The Property Damage**

Defendants also contend that no property damage occurred,
and therefore no duty to defend exists.   (Paper 17, at 13).
Property damage is defined in the CGL policy as

> a. Physical injury to tangible property,
> including all resulting loss of use of that
> property.   All such loss of use shall be
> deemed to occur at the time of the physical
> injury that caused it; or

---

[2] The third complaint in the underlying action was for
fraudulent inducement, a fraud-based claim.   The *Sheets* court
recognized that the insurance company had no duty to defend
against a claim or "intentional misrepresentation, as the terms
of the policy clearly indicate there is no duty to defend or
indemnify against intentional torts." *Sheets*, 342 Md. at 637,
FN 1.   There is no "accident" in this claim, as it is an
intentional tort.   Therefore, it cannot be covered as an
"occurrence."

> b. Loss of use of tangible property that is
> not physically injured. All such loss of
> use shall be deemed to occur at the time of
> the "occurrence" that caused it.

(Paper 17, Exh. 3, CGL policy, page 11 of CG 00 01 10 93). As there was no physical injury in this case, the only potential damage that Plaintiffs can argue is relevant is loss of use, as outlined in subpart b above.

Plaintiffs maintain that property damage "includes economic loss deriving from a loss of use of tangible property." (Paper 22, at 8). That tangible property in this case is a patio that KCI built after the sale of restaurant. (Paper 22, at 14). Plaintiffs maintain that, under the complaint filed by KCI, KCI lost use of the patio (tangible real property) because of misrepresentations by Plaintiffs during negotiation of the contracts of sale. (Paper 22, at 15). KCI's loss of use, Plaintiffs argue, constitutes property damage under the *Lerner* decision and under *French v. Assurance Co. of America*, 448 F.3d 693 (4th Cir. 2006).

In *French*, a family built a home that had a stucco exterior. Unbeknownst to all parties at the time of construction, the stucco was defectively installed and over a period of five years allowed moisture to damage other non-defective parts of the home. *Id*. at 696. The *French* court reviewed the *Lerner* decision, highlighting dicta in the opinion

17

that "if the defect causes unrelated an unexpected . . . property damage to something other than the defective object itself, the resulting damages, subject to the terms of the applicable policy, may be covered." *Id*. at 702 (internal quotations omitted). The court found that the insurance policy in question did cover the "cost to remedy property damage" to otherwise non-defective work caused by "defective workmanship[.]" *Id*. at 703. This case does little to change the analysis in the instant case, however. Plaintiffs attempt to argue that KCI's loss of use of the patio constitutes property damage (or loss of use of the property) to "something other than the property delivered to KCI by a contract of sale." (Paper 22, at 15). The analogy fails.

In this case, no property damage exists and there is no loss of use. Although KCI was unable to seat 400 patrons immediately after it built a patio to increase seating capacity, the rest of the restaurant was still open and functioning and the septic system was in working condition at all times. Moreover, Plaintiffs cannot allege that KCI lost the higher seating capacity, because it did not have the capacity to lose in the first place. The *French* court reiterated a central tenet of *Lerner* that is relevant here: "it should not be unexpected and unforeseen that, if the Building delivered does not meet the

18

contract requirements of the sale, the purchaser will be entitled to correction of the defect." *French*, 448 F.3d at 701(quoting *Lerner*, 120 Md.App. at 537).

The "contract requirements of the sale" between KCI and Plaintiffs included several warranties regarding material facts about the restaurant. (Paper 17, Exh. 1, ¶¶ 16-19). KCI alleged in its complaint that Plaintiffs were in breach with the warranties under the purchase agreement because the restaurant "did not have adequate septic capacity for the number of seats in use at the time KC acquired the Restaurant." (*Id*. at ¶ 22). Plaintiffs were operating the restaurant at the time of the signing of the agreement with 277 seats and 20-30 bar stools – well in excess of the 226 people the septic system could legally handle. That KCI then sued Plaintiffs to repay the costs of expanding the septic system should not have been unexpected, given the contractual language in the purchase agreements. In this case, there is no loss of use and no tangible damage to property that can fit into the definition of "property damage" within the CGL policy.

### 3.  The Causal Connection

Even if the court were to accept Plaintiffs' argument that property damage does exist through economic loss or loss of use, and that there was an "occurrence," the CGL policy requires a

causal link between the "occurrence" and the "property damage." In this case, no such link exists.

Defendants argue, in essence, that the fact that Plaintiffs misrepresented the legal seating capacity limits to KCI did not cause KCI to lose the use of the restaurant, and did not cause the seating capacity to drop to 226 from the promised 400.  In other words, Defendants argue that "[a] misrepresentation that hides pre-existing damage does not cause the damage."  (Paper 17, at 15).

In a case where the underlying action was for negligence and breach of contract, the Court of Special Appeals of Maryland found that the insured was not owed defense or indemnity by the insurer because no causation existed.  *Pyles v. Penn. Manufacturers' Assoc. Insurance Co.*, 90 Md.App. 320 (1992).  The court held that

> The policies thus require a direct causal link or nexus between an insured's liability and property damage.  [Third party contractor's] liability to [home owner] was not, however, a direct result of property damage.  Rather, its liability was a direct result of its negligence and breach of contract in failing to obtain the agreed upon amount of builder's risk insurance on the house.  The basis of [home owner's] earlier action was not property damage, but instead [contractor's] alleged breach of contract and negligence. . . . The fact that property damage occurred in connection with [contractor's] liability, however, is simply

> not sufficient to bring its liability within
> the terms of the policies.

*Pyles*, 90 Md.App. at 325.   Similarly, in the instant action, the underlying claims asserted by KCI were for breach of contract, fraud and negligence – not for property damage.   Plaintiffs were not potentially liable to KCI because of any damage to property, or because of any loss of use, but rather because they had breached warranties and clauses in the purchase agreement, and had negligently misrepresented to KCI that the seating capacity was higher than it actually was.   Therefore, no causal link can exist, even if there were "property damage" or an "occurrence."

### 4.   Remaining Issues

Defendants include a number of arguments regarding exceptions detailed in the CGL policy that also already preclude Plaintiffs from receiving defense or indemnity in this matter. Because no duty to defend or to indemnify exists, it is not necessary to analyze the merits of Defendants' claims regarding the exceptions.

### III. Motion to Seal

Plaintiffs have filed a motion to seal several documents (Paper 23) in connection with their response to the motion for summary judgment.   The motion must comply with Local Rule 105.11, which provides:

> Any motion seeking the sealing of pleadings, motions, exhibits or other papers to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections.  The Court will not rule upon the motion until at least 14 days after it is entered on the public docket to permit the filing of objections by interested parties.  Materials that are the subject of the motion shall remain temporarily sealed pending a ruling by the Court.  If the motion is denied, the party making the filing will be given an opportunity to withdraw the materials.

Local Rule 105.11.  There is also a well-established common law right to inspect and copy judicial records and documents.  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  If competing interests outweigh the public's right of access, however, the court may, in its discretion, seal those documents from the public's view.  *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).

Furthermore, prior to sealing any documents, the court must provide notice of counsel's request to seal and an opportunity to object to the request before making its decision.  *Id.*  Either notifying the persons present in the courtroom or docketing the motion "reasonably in advance of deciding the issue" will satisfy the notice requirement.  *Id.* at 234.  Finally, the court should consider less-drastic alternatives,

such as filing redacted versions of the documents.  If the court decides that sealing is appropriate, the court should provide reasons, supported by specific factual findings, for its decision to seal and for rejecting alternatives.  *Id.* at 235.

Plaintiffs seek to seal (1) a declaration by David A. Kaufmann, (2) the agreement of sale between Kaufmann Enterprises and Gregory Casten (President of KC, Inc.), (3) a promissory note between Kaufmann Enterprises and Gregory Casten, (4) a record of the transfer between Kaufmann Enterprises and KC, Inc. (5) the amortization schedule of the promissory note, (6) the letter from Defendants to Plaintiffs denying that defense or indemnification is required in the underlying action, (7) an invoice and many bills from the law firm representing Plaintiffs, and (8) the confidential settlement agreement reached between KCI and Plaintiffs.  (Paper 23).  Plaintiffs' motion is unopposed.

Plaintiffs have offered no factual representations or arguments as to why the documents should be sealed, other than to note that some of the materials are subject to confidentiality agreements.  They have also offered no explanation as to why any measure other than wholesale sealing would prove insufficient.  Therefore, the motion to seal will be denied.

The court has reviewed the materials, but the only information recited in this opinion also appears in Plaintiffs' memorandum, which is not under seal. (Paper 22). If Plaintiffs would like the materials in the permanent record, they may refile a motion that is in conformity with Local Rule 105.11 within seven days. Alternatively, the material may be withdrawn.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted, and Plaintiff's motion to seal will be denied. A separate Order will follow.

 

 

                                              /s/
_____
DEBORAH K. CHASANOW
United States District Judge